UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Russell P. Flewellen II,

               Plaintiff,

   vs.                      REPORT AND RECOMMENDATION

Michael J. Astrue,
Commissioner of Social
Security,[1]

             Defendant.      Civ. No. 06-3015 (JMR/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the Commissioner's final decision which denied his application for Disability Insurance Benefits ("DIB"). The matter is now before the Court upon the parties' cross-Motions for Summary Judgment. The Plaintiff has appeared by Edward C. Olson, Esq., and the Defendant has appeared by Lonnie F. Bryan, Assistant United States Attorney. For reasons

---

[1]On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security, and pursuant to Rule 25(d)(1), Federal Rules of Civil Procedure, we have substituted him as the named Defendant.

which follow, we recommend that the Defendant's Motion for Summary Judgment be granted, and that the Plaintiff's Motion be denied.

## II. Procedural History

The Plaintiff first applied for DIB on April 29, 2003, at which time, he alleged that he had become disabled on January 1, 2003.  [T. 17, 99-101].  The Plaintiff met the insured status requirement at the alleged onset date of disability, and remains insured for DIB through December 31, 2010.  [T. 102].

The State Agency denied the claims upon initial review, and upon reconsideration.  [T. 65-70].  The Plaintiff made a timely request for a Hearing before an Administrative Law Judge ("ALJ") and, on April 21, 2005, a Hearing was conducted, at which time, the Plaintiff appeared, and was represented by counsel.  [T. 27-64].   Thereafter, on September 7, 2005, the ALJ issued a decision which denied the Plaintiff's claim for benefits.  [T. 14-25].  On September 16, 2005, the Plaintiff requested an Administrative Review before the Appeals Council, [T. 11-13], which, on May 19, 2006, denied further review.  [T. 6-8].  Thus, the ALJ's determination became the final decision of the Commissioner.  Grissom v. Barnhart, 416 F.3d 834, 836 (8th Cir. 2005); Steahr v. Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson v. Chater, 108 F.3d 942, 943-44 (8th Cir. 1997); 20 C.F.R. §404.981.

- 2 -

III.  <u>Administrative Record</u>

A.    <u>Factual Background</u>.  The Plaintiff was fifty-six (56) years old at the time of the Hearing.  [T. 32; 99].  He graduated from college with degrees in sociology, and secondary education, with additional training in the form of testing by the National Association of Security Dealers ("NASD"), the Securities and Exchange Commission ("SEC"), and State securities law examinations, and he has had previous work experience as a financial planner.  [T. 33-34; 113; 163].  The Plaintiff is a military veteran, who served in the United States Marine Corps from July 30, 1966, to September 29, 1968. [T. 344].  At the time of his application for disability, the Plaintiff was working  three (3) hours per day, three (3) days per week, as a self-employed investment broker, and was earning $1,250.00 per month.  [T. 110].  The Plaintiff alleges that he cannot work full time due to migraine headaches, Post Traumatic Stress Disorder ("PTSD"), and diabetes.  [T. 109].

1.    <u>Medical Records Relating to Physical Disability</u>.  On December 13, 2001, the Plaintiff was admitted to the hospital with chest pains which radiated into his arm.  [T. 182].  An EKG was administered at that time and was determined to be negative, [T. 231-32], and he was discharged with instructions to quit smoking. [T. 261].  In September of 2002, the Plaintiff was treated for pneumonia.  [T. 229].

- 3 -

The Plaintiff also has a history of migraine headaches, [T. 167], and has been diagnosed with early diabetes, a left frozen shoulder, degenerative disc disease, and left plantar fasciitis.  [T. 170; 550].

        2.    <u>Medical Records Relating to Mental Disability</u>.  In April of 2001, the Plaintiff sought treatment at the Veteran's Administration ("VA") for PTSD due to increased stress and nightmares.  [T. 222].  Following initial evaluations, on June 4, 2001, the Plaintiff commenced psychotherapy with Rosemary Brown Moore, who is a social worker.  [T. 210-11].  Moore continued to treat the Plaintiff on a regular basis through March of 2005.  [T. 178-79; 182-211; 272-343; 366-91; 403-415; 458-472; 488-570; 579-83].  In treatment notes, Moore observed that the Plaintiff had problems with anger, trust, and emotional closeness, which were related to invalidating experiences in the military and the VA.  [T. 202].  The therapy sessions focused on the Plaintiff's relationships with his girlfriend, and his adult son, his sleep problems, and his frustration with the VA.  [T. 178-79; 182-211; 272-343; 366-91; 403-15; 488-570; 579-83].  At his initial evaluation, and at his yearly treatment reviews, the

Plaintiff's therapists consistently assigned GAF scores of 60 or 61.[2]  [T. 220; 313-14; 382; 542].

In October of 2001, Dr. David Johnson examined the Plaintiff at the request of Moore.  [T. 191-92].  Dr. Johnson concluded that the Plaintiff did not need psychotropic medication, and recommended that the Plaintiff reduce his consumption of alcohol, and continue his therapy with Moore.  [T. 192].

In January of 2003, the VA increased the Plaintiff's disability rating, which was attributed to PTSD, from seventy percent (70%), to one hundred percent (100%), and increased his disability rating, which was related to migraine headaches, from ten percent (10%), to fifty percent (50%), effective April 23, 2001.[3]  [T. 344-7].  The VA also found that the Plaintiff was ten percent (10%) disabled by diabetes, effective January 15, 2005.  [T. 347].

---

[2]The GAF scale considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  DSM-IV-TR, at 34 (4th Ed. 2000).  On the 100 point scale, a rating of between 71-80 indicates only slight impairment in social, occupational, or school functioning; a rating of between 61-70 suggests some difficulty, but "generally functioning pretty well;" a rating of between 51-60 indicates moderate symptoms or difficulties; and a rating of between 41-50 indicates serious and impairing symptoms.  Id.

[3]The VA decision noted that "[an] evaluation of 100 percent is assigned whenever there is evidence of total occupational and social impairment."  [T. 346].

3.   <u>Evaluations</u>.  The Plaintiff underwent a consultative examination by Dr. Alford Karayusuf, at the request of the State Agency, in June of 2003.  [T. 352-56].  At that evaluation, the Plaintiff expressed outrage that he had to undergo the consultative examination, and frustration that the State Agency, and the VA, did not understand the nature of his problems.  [T. 352].  Dr. Karayusuf reported that the Plaintiff was initially extremely irritable, and very angry, although he became more comfortable as the examination proceeded.  [T. 353].  Dr. Karayusuf noted that the Plaintiff emphasized that he was capable of working, although at the time of the evaluation he was only working a couple hours a day, from his home, as an investment broker.  <u>Id.</u>  The Plaintiff was vague about his alcohol and marijuana use.  [T. 354].  Dr. Karayusuf diagnosed PTSD, and a personality disorder, and concluded that the Plaintiff could only work alone, and that he would likely be fired from any job where he had to interact with a supervisor or coworkers.  [T. 355-56].

At the request of the State Agency, Dr. Thomas Kuhlman, and Dr. James Alsdurf, reviewed the evidence of Record in July, and November of 2003, respectively, and concluded that the Plaintiff could learn and remember at least one- to two-step instructions, sustain mental effort at routine, repetitive tasks for two (2) hour periods without taking a break, get along with co-workers and supervisors as

long as contacts were brief, infrequent, and superficial, and adapt adequately to typical stressors and changes that occurred when doing routine and repetitive tasks within a low to moderately pressured work environment.  [T. 430-35].

In June of 2005, Moore completed a questionnaire from the Plaintiff's attorney, which asked her to review the results of Dr. Karayusuf's examination of the Plaintiff. [T. 587-88].  Moore opined that the Plaintiff was incapable of working with the public, and would likely be fired from any job where he had to interact with a supervisor or a coworker.  [T. 587-88].

B.    Hearing Testimony.   The Hearing on April 21, 2005, commenced with some opening remarks by the ALJ, in which he noted the appearance of the parties for the Record.  [T. 29].  The ALJ asked the Plaintiff's attorney if he had any objections to the evidence being introduced into the Record, and the Plaintiff's attorney stated that he did not.  [T. 30].  Next, the ALJ asked the Plaintiff's counsel if he had any opening comments.  Id.

The Plaintiff's attorney began by stating that, although the Commissioner was not bound by determinations of the VA, the ALJ should consider the VA's determinations in reaching his decision, and noted that the VA had raised the Plaintiff's service-connected disability for migraines, from fifty percent (50%) to eighty percent

(80%), since the last evidence submitted to the Record.  Id.  The Plaintiff's attorney added that, while the Plaintiff had applied for DIB for PTSD, he also had a lot of problems with migraines, and that even though the migraines did not have their own Listing, the frequency with which he had sought treatment for his headaches should be compared to the Listings for disabilities such as asthma, which take into consideration the frequency with which an applicant has sought treatment. [T. 31].  In a concluding comment, the Plaintiff's attorney argued that the Plaintiff was disabled either by PTSD, or by migraines, or both.  Id.

The ALJ then swore the Plaintiff to testify, and began his questioning by asking basic descriptive questions.  [T. 32].  The Plaintiff stated that he was fifty-six (56) years old, six (6) feet, two (2) inches tall, and weighed 300 pounds.  Id.  The ALJ asked the Plaintiff about his home life, and the Plaintiff stated that he was not currently married, although he lived with his girlfriend, and had one (1) child, who was twenty-one (21) years old.  [T. 33].  The ALJ asked the Plaintiff if he drove a car, and the Plaintiff confirmed that he did.  Id.

Next, the ALJ asked the Plaintiff about his educational background.  Id.  The Plaintiff explained that, in 1972, he received a Bachelor of Arts from Macalester College in sociology and secondary education, and subsequently, took professional

examinations sponsored by the NASD, the SEC, and the Uniform Law Examination in securities. [T. 33-34].  The Plaintiff testified that he served in the Special Forces of the United States Marine Corps, from 1966 to 1968, and was honorably discharged for medical reasons after having his eardrum ruptured as a result of an explosion.  Id. The Plaintiff testified that his injury continued to impair the hearing in his right ear.  [T. 34-5].

The ALJ next asked the Plaintiff about his employment history, and the Plaintiff explained that he continued to be self-employed as an investment broker, having last worked the Saturday before to the Hearing. [T. 35-36].  The Plaintiff testified that he had earned $16,000.00 from securities trading in 2004, and earned an additional $5,000.00 or $6,000.00 in advisory fees, and that his earnings, in 2002 and 2003, had been roughly comparable.  [T. 36-37].  The ALJ asked the Plaintiff to describe his work, and the Plaintiff explained that he kept his files up to date, and answered client questions, and that he monitored the financial news by having televisions in every room of his house, including his bedroom.  [T. 37].

At this point, the Plaintiff's attorney noted that the Plaintiff's position regarding his income was that he was like an insurance agent who received renewal commissions, as he collected dividends for doing minimal work with mature clients, and

consequently, his work should not be considered substantial as defined by the case law, and the Regulations.  [T. 37-38].  The Plaintiff added that approximately sixteen percent (16%) of his annual income of $16,000.00 came from mature accounts with longstanding clients.   [T. 38].   The ALJ asked the Plaintiff about his level of involvement with his clients, and the Plaintiff explained that he made himself available to his clients, but that he did very little actual work.  [T. 38-39].

The ALJ asked the Plaintiff why he felt that he could not work full time, and the Plaintiff explained that he suffered from migraines and slept poorly, and also suffered from back problems that prevented him from sitting for long periods of time.  [T. 39]. The Plaintiff reported that he had recently received a cortisone shot in his neck to ease his pain, and that his medications included Vicodin,[4] Medrin, Ibuprofen, and Flexeril.[5] Id.  The ALJ asked the Plaintiff how many hours a day he slept, and the Plaintiff testified that his sleep patterns were erratic, with some days having only three (3) or four (4) hours of sleep.  [T. 40].

---

[4]Vicodin is "indicated for the relief of moderate to moderately severe pain." Physicians' Desk Reference, at 530 (60th Ed. 2006).

[5]Flexeril "is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions." Physician's Desk Reference, at 1833 (60th ed. 2006).

- 10 -

The ALJ then asked the Plaintiff about his normal day, and the Plaintiff explained that he did very little, although he would drive his car to the VA, go shopping twice a week, and go to the grocery store twice a month.  Id.  The Plaintiff testified that his girlfriend did the cooking, laundry and cleaning in his household, while he took care of the lawn.  Id.  The ALJ asked the Plaintiff if he read, and the Plaintiff stated that he generally read information about the financial market.  [T. 41].  The Plaintiff testified that he had no visits except for his son, who he saw periodically, and that he attended a regular monthly luncheon with friends, and was unable to sit through a movie because of physical discomfort.  Id.  The Plaintiff explained that his hobby was photography, and that, to pass the time, he would go to a local bar and drink. [T. 41-42].  The ALJ asked the Plaintiff if he had a problem with alcohol, and the Plaintiff denied any addiction, although he admitted that he also smoked marijuana once a month.  [T. 42].

Next, the ALJ asked the Plaintiff about the medications that he was taking, and the Plaintiff testified that he took Vicodin, Flexeril, Ibuprofen, and Medrin for his migraines, and that his medications made him sleepy. [T. 42-43].  The Plaintiff testified that he experienced migraines once or twice a week, and that, if he took his medications at the first sign of symptoms, then they would last approximately three (3)

to four (4) hours.  [T. 43].  The Plaintiff explained that his migraines started with pain on the right side, and that, if the pain became unbearable, he would go to the VA, and they would give him a shot of morphine.  Id.

The ALJ then asked the Plaintiff about other physical problems that he experienced, and specifically how much weight he thought he could lift.  [T. 43-44]. The Plaintiff estimated that he could lift twenty (20) pounds, and added that he had no trouble standing, or moving his fingers, could walk as long as the pace was slow, and could sit for an hour at a time before experiencing pain.  [T. 44-45].  The Plaintiff summarized by stating that he was in constant pain, which he rated as 7/10.  [T. 45]. The ALJ asked if the Plaintiff had ever undergone surgery on his back, and the Plaintiff stated that he had not, and that it was not an attractive option for him.  Id.

The ALJ then asked the Plaintiff if he had anything to add, and the Plaintiff said that he did, and explained that his history of migraines dated back to 1971, and had almost caused him to drop out of college.  Although he had originally received treatment at the VA, he had abandoned that treatment since he felt that he was being treated with discriminatory bias.  [T. 45-46].

The Plaintiff's attorney then asked the Plaintiff about his PTSD, and specifically about Dr. Karayusuf's opinion that his PTSD contributed to his difficulty with

supervisors.  [T. 47].  The Plaintiff explained that he had a lot of jobs, and "didn't always play well with others."  Id.  The Plaintiff's attorney then asked the Plaintiff if he felt that he could work as a financial advisor for eight (8) hours a day, five (5) days a week, and the Plaintiff stated that he could not, as he had to lie down periodically, and his medications for back pain prevented him from functioning.  [T. 48].  The Plaintiff's attorney then stated that the Record contained evidence that the Plaintiff's therapist had noted nightmares and sleep disruption, anger, irritability, and interpersonal difficulties, and that the Plaintiff had been diagnosed with moderate spinal canal stenosis with compression of the spinal cord.  Id.

The ALJ then swore the Medical Expert ("ME") to testify, and asked him if he had any questions for the Plaintiff, and the ME replied that he did not.  [T. 49].  The ALJ then continued the Hearing by asking the ME to set forth the Plaintiff's impairments as he noted them from the interview.  Id.  The ME stated that he was only qualified to address mental health issues, and he observed that the Plaintiff had been diagnosed with PTSD.  Id.  The ME opined that the Plaintiff did not meet or equal the mental health Listings, and that, while the Plaintiff's physicians had reported functional limitations of only self-employment, the ME observed that the Plaintiff was able to maintain social relationships, and to go out in public at least once or twice a week. [T.

50].  The ALJ asked the ME about the Plaintiff's ability to understand and follow simple instructions, and the ME stated that he would not impose any restrictions based solely on the Plaintiff's mental health issues, as he did not find that the Plaintiff's PTSD symptoms supported such a limitation.  [T. 50-51].

The Plaintiff's attorney then asked the ME about the VA's ability to diagnose PTSD, and the ME stated that he believed that the VA had a clinic dedicated to the treatment of PTSD.   [T. 51].   The Plaintiff's attorney asked the ME if he had considered migraines, or lower back problems, in his analysis, and the ME replied that he had only spoken to the Plaintiff's mental health issues.  [T. 51-52].  The ME agreed with the statement of the Plaintiff's attorney that PTSD could negatively affect the ability to work closely with others without being distracted, accepting instructions, and responding appropriately to criticism from supervisors.  [T. 52].  The ME added that Dr. Karayusuf's opinion, that the Plaintiff should work alone, appeared to be substantially accurate.  Id.  The Plaintiff's attorney then asked the ME about the effect of the Plaintiff's current medications on concentration, persistence and pace, and the ME testified that those medications could have a negative effect. [T. 53].

The ALJ then dismissed the ME, and swore the Vocational Expert ("VE") to testify.  Id.  After confirming that the VE was familiar with jobs within the State of

- 14 -

Minnesota, the ALJ invited the VE to question the Plaintiff.  Id.  The VE began by asking the Plaintiff about his expertise in computer operation, and the Plaintiff explained that, even though he typed poorly, he used the computer regularly for his business.  [T. 53-54].  The ALJ then asked the VE if he would make any changes in his vocational analysis, based on what he had heard, and the VE stated that he would add selling as a transferable skill.  [T. 55].

The ALJ then posed a hypothetical to the VE, asking him to assume an individual who was the same age as the Plaintiff, with the same education and work experience, who was impaired with migraine headaches, diabetes, depression, anxiety, and back pain, and who had moderate limitations in social functioning, and in maintaining concentration, persistence and pace.  Id.  The individual was capable of performing medium work, lifting a maximum of fifty (50) pounds occasionally, and twenty-five (25) pounds frequently, could concentrate on, understand and remember, detailed and complex instructions, carry out detailed and complex tasks, and could interact with coworkers or the public on a brief and superficial basis.  Id.  The ALJ continued that the individual could function and cope with ordinary levels of supervision, and could tolerate the typical stressors of a routine repetitive work setting

in a low to moderate pressure work environment.  Id.  The ALJ then asked the VE if such an individual could perform the Plaintiff's past relevant work.  Id.

The VE replied that he did not believe that the individual could, as the Plaintiff's past work was skilled, and required more than brief and superficial contact with others. Id.  The ALJ then asked the VE if there were any other jobs in the regional or national economy that the individual could perform, and the VE stated that the medium category included warehouse worker, with 13,000 positions available in the State, of which 7,000 to 8,000 would be appropriate for the hypothetical individual, hand packager, with 5,000 to 6,000 positions available, and assembler positions, with approximately 9,000 to 10,000 positions available at the medium level.  [T. 56].

The ALJ then posed a second hypothetical to the VE, in which the individual was able to perform medium work, but could concentrate on, understand and remember, only routine repetitive one (1) and two (2) step instructions, carry out routine and repetitive one (1) and two (2) step tasks, could interact with coworkers, and the public, on a brief and superficial basis, could function and cope with the ordinary level of supervision found in most work settings, and could tolerate the typical stressors of a routine repetitive work setting in a low to moderately pressured work environment.  [T. 56-57].  The VE asked the ALJ to clarify the meaning of one

- 16 -

(1) and two (2) step instructions, and the ALJ explained that it was the equivalent of unskilled work.  [T. 57].  The VE replied that the positions he identified in response to the first hypothetical were essentially unskilled work, so his answer would remain unchanged.  Id.

The ALJ then asked the VE how his response would change if the individual were limited to light work, with lifting a maximum of twenty (20) pounds occasionally, and ten (10) pounds regularly, standing, sitting and walking six (6) hours out of an eight (8) hour day, with the ability to concentrate, understand and remember routine, repetitive instructions, carry out routine takes, interact briefly and superficially with coworkers and the public, function under ordinary levels of supervision, and tolerate typical stressors of a routine repetitive work setting in a low to moderately pressure work environment.  [T. 58].  The ALJ asked the VE if an individual with those limitations could perform the Plaintiff's past relevant work, and the VE testified that he could not, but approximately 7,000 to 8,000 positions would be available in assembly, along with 2,000 mail clerk positions, and 4,000 to 5,000 machine operator positions.  Id.

The ALJ then asked the VE how his response would change if the hypothetical were altered so that the individual would have to work alone under limited or no

supervision, with all of the other light work limitations, and the VE replied that all of the positions he listed required some supervision, and therefore, if the individual required a position with no supervision, then none of the positions would be available. [T. 59].  The VE clarified that the level of supervision varied from position to position, and that, if the ALJ wanted to restrict the individual to limited supervision, with only intermittent contact, then positions were available as a cleaner, with 7,000 to 8,000 positions, and machine operation positions, with 1,000 positions available.  [T. 60].

The ALJ then posed another variant on the hypothetical, positing an individual who had marked limitations in social functioning, no ability to interact with coworkers, or the public, on even a brief and superficial basis, who could not tolerate supervision, or the typical stressors of a routine, repetitive work setting.  [T. 61].  The ALJ asked the VE if such an individual could perform the Plaintiff's past relevant work, and the VE stated that it would not be possible, and that the individual also could not find work in the regional or national economy.  Id.

The Plaintiff's attorney then noted the Plaintiff's testimony that he would miss three (3) to four (4) hours of work approximately twice a week due to migraines, and asked the VE if that would preclude competitive employment. [T. 62].  The VE replied that it would.  Id.  The Plaintiff's attorney then noted that all of the positions, which

had been listed by the VE, were very different from the Plaintiff's past competitive work.  Id.  The VE agreed that the Plaintiff would have to undergo a substantial vocational adjustment to assume one of the available positions.  Id.

The ALJ then asked the Plaintiff's attorney if he wished to make a closing statement, and the Plaintiff's attorney reiterated that, while he realized that the ALJ was not bound by the determination of the VA, that the Plaintiff was one hundred percent (100%) vocationally disabled, that decision should be entitled to some deference.  [T. 62-63].

C.    The ALJ's Decision.  The ALJ issued his decision on September 7, 2005. [T. 17-25].   As he was required to do, the ALJ applied the sequential, five-step analytical process that is prescribed by 20 C.F.R. §§404.1520.[6]  As a threshold matter,

_____

[6]Under the five-step sequential process, the ALJ analyzes the evidence as follows:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the

the ALJ concluded that the Plaintiff had not engaged in substantial gainful activity since his alleged onset date of January 1, 2002.  [T. 19].

Next, the ALJ examined whether the Plaintiff was subject to any severe physical impairments, which would substantially compromise his ability to engage in work activity.  Id.  After considering the Plaintiff's medical history, which included the reports of the Plaintiff's treating physicians, in conjunction with the testimony adduced at the Hearing, the ALJ found that the Plaintiff was severely impaired by diabetes mellitus, migraine headaches, degenerative disc disease of the cervical spine, degenerative disc disease of the lumbar spine, and PTSD, with a "rule out" diagnosis of a personality disorder.  Id.

At the Third Step, the ALJ compared the Plaintiff's severe impairments with the impairments contained in Appendix 1, Subpart P, of the Regulations.  See, 20 C.F.R.

---

burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.
Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has an impairment that limits his ability to perform basic work activities; and his impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work, and he cannot perform other work existing in the national economy.  Id. at 754.

§§404.1520(d).  The ALJ determined that the Plaintiff's physical impairments did not meet, or equal, the criteria of any Listed Impairment, based upon the testimony of the ME, and the Record as a whole.  [T. 20].

The ALJ then proceeded to determine whether the Plaintiff retained the "residual functional capacity" ("RFC") to engage in the duties required by his past relevant work, or whether he was capable of engaging in other work which existed in significant numbers in the national economy.  Id.  RFC is defined in the Regulations as the most an individual can still do after considering the effects of physical limitations that can affect the ability to perform work-related tasks.  See, Title 20 C.F.R. §404.1545, and Social Security Ruling 96-8p.  The ALJ recognized that, in order to arrive at the Plaintiff's RFC, he was obligated to consider all of the symptoms, including the Plaintiff's subjective complaints of pain, and that those complaints were to be evaluated under the standard announced in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), Social Security Ruling 96-7p, and Title 20 C.F.R. §404.1529.

After considering the entire Record, including the testimony adduced at the Hearing; the opinions of the Plaintiff's treating physicians; the opinions of the impartial ME; the objective medical evidence; and the Plaintiff's subjective complaints of pain; the ALJ determined the Plaintiff's RFC to be as follows:

> [The Plaintiff] has had the residual functional capacity to perform unskilled medium work; with lifting 50 pounds occasionally, and 25 pounds frequently; standing and walking for up to 6 hours out of an 8 hour day; sitting for up to 6 hours out of an 8 hour day; performing tasks that are routine and repetitive in nature; in a low stress environment; with brief, superficial, and infrequent interactions with others; and performing tasks that require only a limited amount of supervision.

Id.

The ALJ concluded that such an RFC was consistent with the weight of the Record, but was inconsistent with the Plaintiff's assertion that he had been disabled, by his physical impairments, from all work activity since January 1, 2002.  Id.

In determining the Plaintiff's RFC, the ALJ first considered the subjective complaints of the Plaintiff -- that he had difficulty concentrating and completing tasks, and could not sit for long periods of time.  Id.  The ALJ noted that he also evaluated the Plaintiff's complaints of mental impairments, and considered the ME's testimony that, based upon his diagnoses of PTSD and anxiety, the Plaintiff would experience mild restrictions in activities of daily living, mild to moderate restrictions in maintaining social functioning, and moderate restrictions in maintaining concentration, persistence, and pace.  [T. 20-21].  The ALJ additionally noted that the Plaintiff had experienced no episodes of decompensation.  [T. 21].

- 22 -

After considering the Record, including the testimony of the Plaintiff, the ALJ concluded that the Plaintiff would experience mild restrictions in activities of daily living.  Id.  Specifically, the ALJ recounted the Plaintiff's testimony that he drove, cooked, performed yard work, shopped, read, watched television, groomed and bathed himself, participated in organizations, visited relatives, talked on the phone, paid bills and handled finances, and went out to eat, out to the movies, and dancing. Id.  In addition, the ALJ observed that the Plaintiff's therapy notes suggested that the Plaintiff continued to manage his own business.  Id.

The ALJ next found that the Plaintiff experienced mild to moderate restrictions in social functioning.  Id.  The Plaintiff's therapist observed that the Plaintiff used anger as a primary defense, but also recorded him as open and observant during the same counseling session.  Id.  Dr. Karayusuf examined the Plaintiff and found that he likely would have significant difficulties getting along with co-workers and supervisors, and concluded that the Plaintiff could not work with the public.  Id.  The ALJ contrasted that observation with the Plaintiff's report that he lived with his girlfriend, had a very good friend in Chicago, visited with relatives, and talked on the telephone and with his neighbors.  Id.

- 23 -

The ALJ further found that the Plaintiff was moderately limited in maintaining concentration, persistence, and pace.  Id.  Dr. Karayusuf considered the Plaintiff to be oriented, with fair immediate digit recall and intact recent and remote memory, and he felt that the Plaintiff was of average intelligence and capable of understanding, retaining, and following, simple instructions.  Id.  Based upon these observations, as well as the lack of any episodes of decompensation, the ALJ found that the Plaintiff's mental impairments were severe, but did not meet or equal the Listings.  Id.

The ALJ also considered the Plaintiff's physical impairments.  Id.  Dr. Sean Casey recorded, in November of 2001, that the Plaintiff suffered from migraine headaches, and an MRI of the Plaintiff's brain was within normal limits.  Id.  The Plaintiff was additionally diagnosed with a mild bulging disc and, while he had suffered chest pain, the Plaintiff had a negative stress test in January of 2002.  Id.  The ALJ also considered the Plaintiff's diagnosis of diabetes, including records from June of 2003, which disclosed that his symptoms were well-controlled with diet alone.  [T. 22].  The Plaintiff took Midrin for his migraines, which was effective.  Id.  In August of 2003, the Plaintiff reported some left shoulder pain and, on examination, was found to have full bilateral strength, with intact sensation and symmetric bilateral deep tendon reflexes.  Id.

- 24 -

In March of 2004, the Plaintiff reported low back pain, and an x-ray of his lumbar spine revealed mild anterior osteophytic spurring, while an x-ray of his left shoulder showed only mild arthritis.  Id.  A further x-ray of the Plaintiff's lumbar spine, which was taken in April of 2004, showed no significant abnormalities.  Id.  In March of 2004, the Plaintiff's diabetes was observed to be controlled by diet, and his migraines controlled with Midrin.  Id.  Treatment notes from January of 2005, reflect that the Plaintiff complained of migraine headaches, although his diabetes was well controlled, with full bilateral strength, intact sensations, and normal gait.  Id.  The Plaintiff reported neck and back pain in February of 2005, and an MRI of the Plaintiff's cervical spine revealed mild to moderate multi-level neuroforminal stenosis, while an MRI of the Plaintiff's thoracic spine was normal.  Id.

The ALJ advised that, in arriving at the Plaintiff' RFC, he considered the opinions of the State Agency physicians who reviewed the Plaintiff's record, and gave those opinions some weight since they reported that the Plaintiff was capable of performing medium work.  Id.  However, the ALJ declined to adopt those opinions and instead reduced the Plaintiff's RFC to accommodate additional limitations based on the Plaintiff's mental impairments.  Id.  The ALJ also considered the treatment records of Moore, the Plaintiff's therapist, who stated that the Plaintiff would likely be

fired from any position where he had to interact with coworkers, a supervisor, or the public. [T. 22-23]. The ALJ declined to give that opinion significant weight, since it was inconsistent with Moore's own treatment notes recording the Plaintiff's GAF score as 60, and was also inconsistent with the Plaintiff's ability to maintain his investment business, as well as the ongoing relationship with his girlfriend. [T. 23].

The ALJ also considered the VA decision which found that the Plaintiff was one hundred percent (100%) disabled due to PTSD, but declined to give that decision significant weight, since the VA criteria for establishing disability was significantly different from that employed by the Commissioner. Id. The ALJ referenced Dr. Karayusuf's statement that the Plaintiff would be unable to work with the public, or in any position in which he had to interact with coworkers or a supervisor, and declined to give that opinion significant weight, as it appeared to be based largely on the Plaintiff's subjective report of his psychological symptoms, and his manifestation of anger during his consultative examination, but was inconsistent with his ability to live with his girlfriend, and maintain a relationship with his therapist, his business clients, and family members. Id.

The ALJ observed that the Plaintiff maintained a significant range of daily activities, which was inconsistent with total disability. Id. Moreover, the ALJ

considered that the Plaintiff took Ibuprofen and Midrin for the symptoms of his impairments, and reported no ongoing side effects from either of those medications. Id. Finally, the ALJ considered the Plaintiff's work history, and found that the Plaintiff's earning record, in some years, was consistent with full time employment, while the earning records from other years suggested part time employment, which the ALJ found to suggest a lack of interest in, or need for, full time employment. Id.

The ALJ found that, while the Plaintiff was impaired by diabetes, migraine headaches, degenerative disc disease of the cervical and lumbar spine, and PTSD, the Record showed that the Plaintiff's diabetes was controlled through diet, and his migraines were controlled with medication, while his degenerative disc disease was only moderately severe, with only conservative treatment recommended. [T. 24]. The ALJ additionally determined that the Plaintiff experienced only mild to moderate symptoms secondary to his mental impairments. Id. For those reasons, the ALJ found that the Plaintiff's subjective complaints were not entirely credible. Id.

Proceeding to the Fourth Step, the ALJ concluded, based upon the VE's analysis, and inclusive of the RFC that the ALJ had determined, that the Plaintiff would be unable to perform his past relevant work as a financial planner, which was skilled sedentary work. Id.

Accordingly, the ALJ noted that, at the final step, the ALJ was to determine whether there were other jobs, existing in significant numbers in the national economy, that the Plaintiff could perform given his RFC, age, education, and work experience. Id.  The ALJ expressly noted that the burden of proof shifts, at that Step, to the Commissioner.  Id.  The VE concluded that the Plaintiff , who was approaching advanced age and had education beyond a high school diploma, could find employment in a range of occupations, such as a cleaner, of which there were 7,000 to 8,000 jobs available, as a machine operator, of which there were 1,000 jobs available, and as an assembler, of which there were 1,000 to 2,000 jobs available in the regional economy.   Thus, the ALJ concluded that the Plaintiff was capable of performing other jobs which existed in significant numbers in the national economy. Id.

Based upon the testimony of the VE, and after taking into consideration the Plaintiff's age, educational background, and RFC, the ALJ concluded that the Plaintiff was not disabled at any time from January 1, 2002, through the date of the ALJ's decision.  [T. 25].

IV.  Discussion

A.   <u>Standard of Review</u>.   The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole.  See, <u>Title 42 U.S.C. §405(g)</u>; see also, <u>Moore ex rel. Moore v. Barnhart</u>, 413 F.3d 718, 721 (8th Cir. 2005); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002); <u>Qualls v. Apfel</u>, 158 F.3d 425, 427 (8th Cir. 1998).  This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision.  See, <u>Morse v. Shalala</u>, 32 F.3d 1228, 1229 (8th Cir. 1994), citing <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488-91 (1951).  Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, <u>Cox v. Apfel</u>, 160 F.3d 1203, 1206 (8th Cir. 1998); <u>Moore ex rel. Moore v. Barnhart</u>, supra at 721, and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed.  See, <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998).  On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied.  See, <u>Loving v. Secretary of Health and Human Services</u>, 16 F.3d 967, 969 (8th Cir. 1994); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  See, Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005), citing Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001).  Stated otherwise, "[s]ubstantial evidence is something less than a preponderance, but enough that a reasonable mind would conclude that the evidence supports the decision."   Banks v. Massanari, 258 F.3d 820, 822 (8th Cir. 2001). Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'"  Vandenboom v. Barnhart, 412 F.3d 924, 927 (8th Cir. 2005), quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001), quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996).   Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result.  See, Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice,"

within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal.  See, <u>Culbertson v. Shalala</u>, 30 F.3d 934, 939 (8th Cir. 1994); see also, <u>Haley v. Massanari</u>, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, <u>Shannon v. Chater</u>, 54 F.3d 484, 486 (8th Cir. 1995), or 'because we would have decided the case differently.'"), quoting <u>Holley v. Massanari</u>, 253 F.3d 1088, 1091 (8th Cir. 2001).  Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record <u>de novo</u>.  See, <u>Hilkemeyer v. Barnhart</u>, 380 F.3d 441, 445 (8th Cir. 2004); <u>Flynn v. Chater</u>, 107 F.3d 617, 620 (8th Cir. 1997); <u>Roe v. Chater</u>, 92 F.3d 672, 675 (8th Cir. 1996).

    B.    <u>Legal Analysis</u>.  In support of his Motion for Summary Judgment, the Plaintiff advances the following arguments:

        1.    That the RFC Determined by the ALJ was Incorrect; and

        2.    That the Hypothetical Propounded to the VE was Improper.

See, <u>Plaintiff's Memorandum</u>, <u>Docket No. 11</u>, at 7-8.

- 31 -

We address each contention below.

      1.    <u>Whether the RFC Determined by the ALJ Was Incorrect.</u>

The Plaintiff argues that the ALJ's RFC determination was incorrect, because the ALJ failed to give proper weight to the opinion of the Plaintiff's examining physician, and his treating medical professional, and failed to consider the VA's determination that the Plaintiff was one hundred percent (100%) disabled from gainful employment.[7]   We examine each contention, in turn.

---

[7]In his <u>Memorandum in Support</u>, <u>Docket No. 11</u>, the Plaintiff only challenges the ALJ's assessment of his mental impairments, and therefore, we follow suit, and confine our review of the ALJ's decision to that aspect of the Commissioner's decision.

a.    Whether the ALJ Abused his Discretion in Failing to Give Controlling Weight to the Opinion of the Plaintiff's Treating Medical Professional, and a Consultative Examining Medical Source.

1)    Standard of Review.  When a case involves medical opinion -- which is defined as "statements from physicians and psychologists or other acceptable medical sources" -- the opinion of a treating physician must be afforded substantial weight.  See, 20 C.F.R. §§404.1527 and 416.927; see also, Forehand v. Barnhart, 364 F.3d 984, 986 (8th Cir. 2004); Burress v. Apfel, 141 F.3d 875, 880 (8th Cir. 1998); Grebenick v. Chater, 121 F.3d 1193, 1199 (8th Cir. 1997); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996).  Nevertheless, an opinion rendered by a claimant's treating physician is not necessarily conclusive.  See, Forehand v. Barnhart, supra at 986 ("A treating physician's opinion is generally entitled to substantial weight, although it is not conclusive and must be supported by medically acceptable clinical and diagnostic data."), quoting Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998).

An ALJ may discount a treating physician's medical opinion, and adopt the contrary medical opinion of a consulting physician, when the treating source's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the

Record as a whole.  See, <u>Rogers v. Chater</u>, 118 F.3d 600, 602 (8th Cir. 1997); <u>Pena v. Chater</u>, supra at 908; <u>Ghant v. Bowen</u>, 930 F.2d 633, 639 (8th Cir. 1991); <u>Kirby v. Sullivan</u>, supra at 1328; <u>Ward v. Heckler</u>, 786 F.2d 844, 846 (8th Cir. 1986).

The opinion of a treating physician may also be discounted if other assessments are supported by better, or by more thorough, medical evidence.  See, <u>Rogers v. Chater</u>, supra at 602; <u>Ward v. Heckler</u>, supra at 846.  In short, the ALJ is not required to believe the opinion of a treating physician when, on balance, the medical evidence convinces him otherwise.  <u>Id.</u>  As but one example, a treating physician's opinion is not entitled to its usual substantial weight when it is, essentially, a vague, conclusory statement.  See, <u>Stormo v. Barnhart</u>, 377 F.3d 801, 805-6 (8th Cir. 2004), citing <u>Piepgras v. Chater</u>, 76 F.3d 233, 236 (8th Cir. 1996), citing, in turn, <u>Thomas v. Sullivan</u>, 928 F.2d 255, 259 (8th Cir. 1991).  Rather, conclusory opinions, which are rendered by a treating physician, are not entitled to greater weight than any other physician's opinion.  <u>Piepgras v. Chater</u>, supra at 259; <u>Metz v. Shalala</u>, 49 F.3d 374, 377 (8th Cir. 1995).

The Code of Federal Regulations sets forth additional factors to assist the ALJ in determining what weight should be accorded to the opinion of a given physician, including a treating physician.  The Regulations encourage the ALJ to afford more

- 34 -

weight to those opinions which are "more consistent with the record as a whole." See, 20 C.F.R. §§404.1527(d)(4) and 416.927(d)(4). More weight is also to be extended to "the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." See, 20 C.F.R. §§404.1527(d)(5) and 416.927(d)(5). When presented with a treating physician's opinion, the ALJ is obligated to examine the nature and extent of the treatment relationship, attributing weight to such an opinion that is proportionate to the knowledge that the medical provider has about the claimant's impairments. See, 20 C.F.R. §§404.1527(d)(2)(ii) and 416.927(d)(2)(ii). Further, the Regulations make clear that the opinions of treating physicians, on questions reserved for the Commissioner -- such as whether a claimant is disabled, or is unable to work -- are not to be given any weight by the ALJ. See, 20 C.F.R. §§404.1527(e)(1) and 416.927(e) (1). Finally, the medical source's familiarity with the evidentiary requirements of the disability program is a relevant factor in assessing the weight of that source's opinion. 20 C.F.R. §§404.1527(d)(6) and 416.927(d)(6).

        2) <u>Legal Analysis</u>. The Plaintiff argues that the ALJ failed to afford proper weight to the opinions of the consultative examination of Dr. Karayusuf, and the Plaintiff's treating therapist, Moore, when he relied upon the testimony of the

State Agency's consulting physicians, and the ME. We disagree, for we find that, when the evidence of Record is viewed in its totality, those portions of the opinions, which were expressed by Dr. Karayusuf, and Moore, and which were rejected by the ALJ, were not supported by substantial evidence.

As previously noted, the ALJ need not give any weight to a consultative, or a treating physician's conclusory statements regarding total disability. See, 20 C.F.R. §§404.1527(e)(1), and 416.927(e)(1); Rogers v. Chater, supra at 602. If justified by substantial evidence in the Record as a whole, the ALJ can discount the examining, or treating physician's opinion. See, Rogers v. Chater, supra at 602; Ward v. Heckler, supra at 846. Here, the ALJ found that Dr. Karayusuf's conclusion, dated June 10, 2003, [T. 352-56], that the Plaintiff was unable to be productively employed due to his mental disabilities, was not supported by substantial evidence in the Record as a whole. [T. 23].

In his assessment of the Plaintiff, Dr. Karayusuf, a one-time-only examiner of the Plaintiff, concluded that the Plaintiff was incapable of working with the general public, and was likely to be fired from any job in which he had to interact with a supervisor or co-workers. [T. 356]. Dr. Karayusuf supported those assertions by noting that, during his once only examination of the Plaintiff, the Plaintiff had

- 36 -

expressed his contempt for the State Agency, and the VA, in an angry and hostile manner, and was only selectively cooperative. [T. 355]. However, Dr. Karayusuf also noted that the Plaintiff was oriented to time, place and person, with no hallucinations or delusions, and no psychomotor retardation, did not appear to be tense or anxious, had good eye contact, neutral mood, coherent speech and appropriate affect. Id.

The ALJ considered Dr. Karayusuf's opinion, but declined to give it significant weight, as it appeared to be based largely on the Plaintiff's own reports of psychological symptoms, and his angry presentation during the examination. [T. 23]. In addition, the ALJ found that Dr. Karayusuf's assertion, that the Plaintiff could not work with a supervisor or co-workers, or have any contact with the general public, was inconsistent with his ability to maintain a relationship with his girlfriend, therapist, and business clients, as well as his relationships with family members and friends. Id.

Additionally, the ALJ considered the opinion of Moore, who stated, in a questionnaire dated April 25, 2005, that the Plaintiff would likely be fired from any job where he had to interact with co-workers, or with a supervisor, and that he was incapable of interacting with the public. [T. 587-88]. Moore did not support those assertions with any evidence in the Record, and the ALJ noted that he did not give Moore's opinions significant weight, as they were inconsistent with her other opinions

- 37 -

in the Record, such as her appraisal that the Plaintiff had a GAF score of 60, which indicated only moderate impairment, and almost mild impairment.   See, Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005).   In addition, the ALJ was properly impressed with the Plaintiff's ability to maintain an investing business for elderly clients, and maintain an ongoing relationship with his girlfriend.  [T. 23].

Although he declined to give controlling weight to the opinions of Dr. Karayusuf, and Moore, that the Plaintiff was incapable of working under supervision or with co-workers, the ALJ considered other assessments performed by the Plaintiff's treating medical professionals, and the ME, and additionally conducted his own review of the medical evidence.  [T. 21].  Specifically, the ALJ adopted the opinion of the ME, that the Plaintiff was mildly limited in activities of daily living, and noted that the Plaintiff admitted that he drove a car, cooked, performed yard work, shopped, read, watched television, groomed and bathed himself, participated in organizations, visited with relatives, talked on the telephone, paid bills, went out to eat, and managed his own business.  Id.  The ALJ also accepted the ME's opinion, that the Plaintiff was mildly to moderately limited in social functioning, as finding support in substantial evidence.  Id.  In making that finding, the ALJ observed that Moore's treatment notes from February of 2002, stated that the Plaintiff was open and

cooperative during therapy, and that the Plaintiff reported that he lived with his girlfriend, had a very good friend in Chicago, visited relatives, and talked on the telephone, and with neighbors. Id.

In accepting the ME's evaluation of the Plaintiff as moderately restricted in maintaining concentration, persistence, and pace, the ALJ observed that Dr. Karayusuf recorded, in his clinical notations, that the Plaintiff was oriented times three, with fair immediate digit recall, intact recent and remote memory, of average intelligence, and capable of understanding, retaining, and following simple instructions. Id.  Under the circumstances here, we are aware of no authority that the ALJ must abdicate his obligation to assess credibility, and to weigh conflicting medical opinions, simply because two medical sources have expressed, in solely conclusory terms, opinions as to the Plaintiff's inability to work.  See, e.g., Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005)("A medical source opinion that an applicant is 'disabled' or 'unable to work,' however, involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight."), citing Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004); Vandenboom v. Barnhart, supra at 750 ("Dr. Hines [i.e., the claimant's treating neurologist] was of the opinion that Vandenboom would not be able to return to work, but a treating

physician's opinion that a claimant is not able to return to work 'involves an issue reserved for the Commissioner and therefore is not the type of "medical opinion" to which the Commissioner gives controlling weight."), quoting Ellis v. Barnhart, supra at 994. As a consequence, we find that the ALJ fulfilled his responsibilities under the Regulations, by explaining, and justifying, the weight that was given to each of the medical source opinions, and why he found some more persuasive than others. See, 20 C.F.R. §404.1527(f)(2)(ii).

The Plaintiff argues that the ALJ erred in giving weight to the report of the non-treating State Agency physicians, which was dated July 17, 2003, [T. 433], as it was not based on the Plaintiff's complete medical records. The Plaintiff argues that treatment notes disclosed PTSD, that post-dated the report of July 17, and those notes were included in the Administrative Record, but were not subject to review by the non-treating physicians, and therefore, their opinions cannot constitute substantial evidence. See, Plaintiff's Reply Memorandum, Docket No. 16, at p. 2. However, in his decision, the ALJ considered, but did not adopt, the opinions of the State Agency physicians, since he further reduced the Plaintiff's RFC to accommodate additional limitations arising from his mental impairments. [T. 22]. While it is true that an ALJ's determination must be based on medical evidence of the plaintiff's RFC at the time of

the hearing, see, <u>Williams v. Barnhart</u>, 2002 WL 31185864 at *5 (D. Minn., September

30, 2002), citing <u>Frankl v. Shalala</u>, 47 F.3d 935, 937 (8th Cir. 1995), here, the ALJ did

not give substantial weight to those opinions, but merely considered them in his overall

review of the Record, and we do not find reversible error in that respect.

We are mindful that the ALJ was confronted by competing and conflicting

medical opinions, as professed by consultative, and treating physicians and, under

those circumstances, the ALJ's obligation is to weigh the competing evidence and

draw findings based upon the substantial weight of the evidence of Record.  Notably,

the ALJ did not discredit Dr. Karayusuf's, and Moore's, medical opinions in total,  nor

did he accept the ME's appraisals without qualification.  Rather, consistent with his

"function to resolve conflicts among the various treating and examining physicians,"

<u>Tindell v. Barnhart</u>, 444 F.3d 1002, 1004 (8th Cir. 2006), quoting <u>Vandenboom v.

Barnhart</u>, supra at 749-50, the ALJ thoroughly reviewed the entirety of the Record and

based his resolution of the medical disputes on substantial evidence.  We do not

suggest that, were we to consider the matter as one of first impression, we would have

reached the same result, we simply acknowledge that the resolution the ALJ reached

with well within the Commissioner's "zone of choice."  See, <u>Vandenboom v. Barnhart</u>,

supra at 749, citing, and quoting, Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004).

In sum, where as here, medical evidence conflicts, the obligation of the ALJ is to consider "all of the medical evidence, including [the ME's testimony], weigh[] this evidence in accordance with the applicable standards, and attempt[] to resolve the various conflicts and inconsistencies in the record." Hudson ex. rel. Jones v. Barnhart, 345 F.3d 661, 667 (8th Cir. 2003). After close review, we are satisfied that the ALJ properly weighed the medical opinions in the record, and afforded those opinions the weight they deserved when considered on the Record as a whole. See, Bentley v. Shalala, 52 F.3d 784, 785 (8th Cir. 1995)("It is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'"), quoting Cabrnoch v. Bowen, 881 F.2d 561, 564 (8th Cir.1989).

       b.    The ALJ's Asserted Failure to Consider the VA's 100% Disability Rating.

       1)    Standard of Review. Disability determinations, by other governmental agencies, are not binding on an ALJ. See 20 C.F.R. §404.1504. Moreover, our Court of Appeals has held that a disability determination, by the VA, is not binding on an ALJ when considering a Social Security applicant's claim for

DIB.  See, <u>Pelkey v. Barnhart</u>, 433 F.3d 575, 578 (8th Cir. 2006), citing <u>Fisher v. Shalala</u>, 41 F.3d 1261, 1262 (8th Cir. 1994); <u>DuBois v. Barnhart</u>, 137 Fed. Appx. 920, 921 (8th Cir. 2005); <u>Jenkins v. Charter</u>, 76 F.3d 231, 233 (8th Cir. 1996).  However, findings of disability by the VA, and other Federal agencies, "even though they are not binding on an ALJ, are entitled to some weight and must be considered in the ALJ's decision."  <u>Morrison v. Apfel</u>, 146 F.3d 625, 628 (8th Cir. 1998).

2)     <u>Legal Analysis</u>.  The Plaintiff asserts that the ALJ erred in failing to consider the VA's finding of one hundred percent (100%) disability from PTSD, when he determined the Plaintiff's RFC.  However, the Record makes clear that the Plaintiff's disability rating from the VA was raised twice by the Plaintiff's attorney during the Hearing, [T. 30, 62-3], and the ALJ specifically noted, in the Hearing Decision, that he had considered the VA's determination, and declined to give it significant weight since the criteria employed by the VA to establish disability was significantly different from that applied by the Social Security Administration.  [T. 23].  As a result, it is plain that the ALJ considered the VA's determination.

Moreover, the only evidence presented by the Plaintiff, other than his testimony at the Hearing, was the eleven (11) page Rating Decision of the VA, which is dated January 24, 2003 [T. 344-50], and the notice of Service Compensation increase dated

- 43 -

February 5, 2003.   [T. 94-98].   The Rating Decision affirms that the Plaintiff's disability rating, based upon PTSD, migraine headaches, and diabetes, was increased, based on evidence submitted to the VA.   Id.   However, that evidence is not detailed in the Decision, and the Decision only provides general criteria for the increase in disability rating for each disorder, without specifying which of those criteria were considered by the VA administrators in rendering their decision.   Id.   Specifically, in increasing the Plaintiff's disability due to PTSD, the VA Decision notes that the Plaintiff was considered to be one hundred percent (100%) disabled as the evidence showed "ongoing, extensive treatment for this disability," and explained that such a rating was given when there was evidence of "total occupational and social impairment."   [T. 346].   In his evaluation of the Record, however, the ALJ acknowledged that the Plaintiff was impaired by PTSD, but determined that, under the Social Security Regulations, the Plaintiff was not disabled by that impairment.   [T. 21-23].

Further, the Record supports the ALJ's finding that the Plaintiff was not totally disabled by PTSD.   First, the ALJ found that the Plaintiff's allegation, that he was unable to work because of PTSD, as well as because he had difficulty concentrating and completing tasks, were not consistent with, or supported by, the objective medical

records, or his course of treatment.   [T. 20].   As previously discussed, the ALJ

considered the Plaintiff's significant and varied activities of daily living, and his ability

to manage a business [T. 21], and to maintain an ongoing relationship with his

girlfriend.  [T. 23].  The ALJ noted that the Plaintiff reported no ongoing side effects

from his prescribed medications, id., and that the objective medical records noted that

the Plaintiff experienced only mild to moderate symptoms secondary to his mental

impairments.  [T. 24].

Notably, the ME was not questioned by Plaintiff's counsel as to the basis for

the VA disability determination, nor was the ME questioned as to the potential

relevance of such a determination.  We accept that, in an appropriate case, the failure

of the ALJ to give "explicit attention" to a VA finding of disability, warrants a reversal

and remand.  See, Morrison v. Apfel, 146 F.3d 625, 627 (8th Cir. 1998).  In Morrison,

however, the Court expressly noted that "an extensive physical examination

documenting [the claimant's] medical problems, followed by a finding of a permanent

and total disability by another government agency, all of which occupie[d] some thirty

pages in the record, merits more than simply an implicit rejection."  Id.  No such

documentation has been presented here, and the Record before us shows that the ALJ

considered the VA evaluation in making his decision.  Cf., Brown v. Massanari, 21

Fed.Appx. 541, 542, 2001 WL 1352234 at *1 (8th Cir., November 5, 2001)("[T]he ALJ's failure to discuss explicitly the Veteran's Administration's (VA's) determination of disability is inconsequential, as the determination consists only of two pages and reports findings that are not supported in the record before the ALJ.").

    We recognize the importance that VA disability benefits play in assisting past military servicemen with incapacitating injuries, and illnesses, as a recognition of our nation's indebtedness to those who have served with devotion to duty, but the eligibility for such benefits is determined by the VA, and we have been presented with no authority that the VA rating would have either qualified the Plaintiff for benefits under a Listed Impairment, or at any other Step in the sequential analysis.  Here, the VA's rating, and the bases for that rating, were not ignored by the ALJ, but were considered and assessed in the light of the whole Record presented.   While we acknowledge some facial inconsistency, which arises when the VA rates an individual as being totally disabled, yet the same individual is denied Social Security benefits, the basis for different rulings can be explained by differences in the Record, and opinions presented, or by differences in the purposes served by the differing standards of disability ratings.  Here, the Record supports the ALJ's decision, and the ALJ did not ignore, but rather, fully considered, the VA's rating of the Plaintiff.  Cf., Lacewell v.

Barnhart, 123 Fed.Appx. 243, 245 (8th Cir. 2005)(affirming a denial of Social Security benefits, notwithstanding a contrary VA disability award).

Given our independent review of the entire Record, we conclude that the ALJ considered the VA's assessments, and determined that those assessments were not persuasive in finding the Plaintiff disabled, under the Social Security Act, during the relevant time period.  As a result, we find no reversible error in this respect, and we turn to the Plaintiff's second challenge to the ALJ's decision.

2.    Whether the Hypothetical Posed to the VE Was Correct.

a.    Standard of Review.  In determining the Plaintiff's RFC, and in framing an appropriate hypothetical for a VE, the ALJ need only include the limitations he accepted, as supported by substantial evidence.  See, Pertuis v. Apfel, 152 F.3d 1006, 1007 (8th Cir. 1998); Rappoport v. Sullivan, 942 F.2d 1320, 1323 (8th Cir. 1991).  However, when an ALJ finds that a Plaintiff suffers from impairments, the hypothetical posed to the VE must include those impairments.  See, Brachtel v. Apfel, 132 F.3d 417, 421 (8th Cir. 1997); Newton v. Chater, 92 F.3d 688, 694-95 (8th Cir. 1996)("A hypothetical question must precisely describe a claimant's impairments so that the vocational expert may accurately assess whether jobs exist for the claimant."), citing Smith v. Shalala, 31 F.3d 715, 717 (8th Cir. 1994); Stout v. Shalala, 988 F.2d

853, 855 (8th Cir. 1993). Those facts in the hypothetical are designed to replicate the

Plaintiff's RFC, so as to allow the VE to identify jobs in the economy, if any there be,

which an individual, with functional limitations like those of the Plaintiff, would be able

to perform. See, Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991); Cline v.

Sullivan, 939 F.2d 560, 565 (8th Cir. 1991).

Moreover, it is well-settled that the testimony of a VE, which is based upon a

properly-phrased hypothetical question, constitutes substantial evidence. See, e.g.,

Howard v. Massanari, supra at 582; Warburton v. Apfel, 188 F.3d 1047, 1049 (8th Cir.

1999); Porch v. Chater, 115 F.3d 567, 571 (8th Cir. 1997). In order to rely upon a

VE's opinion, however, the hypothetical posed "must fully set forth a claimant's

impairments." Sullins v. Shalala, 25 F.3d 601, 604 (8th Cir. 1994), citing Totz v.

Sullivan, 961 F.2d 727, 730 (8th Cir. 1992).

        b.    Legal Analysis. The Plaintiff argues that the ALJ's

hypothetical was flawed because it did not accurately describe the limitations imposed

by the Plaintiff's impairments. We have already determined that the ALJ thoroughly

reviewed the Record so as to conclude that the Plaintiff's symptoms from his mental

health impairments, including PTSD, were insufficient to render him disabled, and we

also determined that the ALJ did not err in not affording substantial weight to the

opinions of the Plaintiff's therapist, his consultative physician, or to the VA's prior disability determination.  Therefore, it was appropriate for the ALJ to  only include, in his hypothetical to the VE, the limitations he accepted, as supported by substantial evidence.  See, Pertuis v. Apfel, supra at 1007; Rappoport v. Sullivan, supra at 1323.

The hypothetical posed to the VE included the education, work experience,  and physical and mental work-related limitations, which were consistent with the Record; namely, migraine headaches, diabetes, depression, anxiety, and back pain, as well as moderate limitations in social functioning and maintaining concentration, persistence and pace.  [T. 55].  The VE testified that the hypothetical individual could not perform past relevant work as a financial planner, but would be able to perform medium routine repetitive work.  [T. 56].  Accordingly, the ALJ's finding, that the Plaintiff was not disabled because there were positions available in the national and regional economy, was supported by substantial evidence in the Record as a whole.  See, Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999)("A hypothetical question 'is sufficient if it sets forth the impairments which are accepted as true by the ALJ.'"), quoting Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985); Andres v. Bowen, 870 F.2d 453, 455 (8th Cir. 1989).

Nor is there anything, in the materials submitted to the Appeals Council, which would warrant a different result.  Therefore, finding no error in this, or in any other aspect of the ALJ's decision, we recommend that the Defendant's Motion for Summary Judgment be granted, and that the Plaintiff's cross-Motion be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

1.      That the Plaintiff's Motion [Docket No. 10] for Summary Judgment be denied.

2.     That the Defendant's Motion [Docket No. 13] for Summary Judgment be granted.

Dated: July 16, 2007                        s/Raymond  L. Erickson
                                            Raymond L. Erickson
                                            CHIEF U.S.  MAGISTRATE JUDGE

**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by no later than **August 2, 2007**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than **August 2, 2007**, unless all interested parties

stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the

transcript in order to resolve all of the objections made.